In the United States District Court
For the Eastern District of Wisconsin
Green Bay Division

| | |
|---|---|
| **Michael Langenhorst, Michael D. LeMay, Stephen Fifrick**, | Case No.: _____ |
|     *Plaintiffs,* | |
|      *v.* | **Verified Complaint for Declaratory and Injunctive Relief** |
| **Laure Pecore**, in her official capacity as Clerk of Menominee County, Wisconsin; **Scott McDonell**, in his official capacity as Clerk of Dane County, Wisconsin; **George L. Christenson**, in his official capacity as Clerk of Milwaukee County, Wisconsin; **Julietta Henry**, in her official capacity as Milwaukee County, Wisconsin Elections Director; **Rick Baas**, **Dawn Martin**, and **Tim Posnanski**, in their official capacities as Milwaukee County, Wisconsin Election Commissioners; **Ann S. Jacobs**, in her official capacity as Chair of the Wisconsin Elections Commission, **Mark L. Thomsen**, in his official capacity as Vice-Chair of the Wisconsin Elections Commission, **Marge Bostelmann**, in her official capacity as Secretary of the Wisconsin Elections Commission; **Julie M. Glancey**, **Dean Knudson**, and **Robert F. Spindell, Jr.** in their official capacities as Wisconsin Election Commissioners; and **Tony Evers**, in his official capacity as Governor of the State of Wisconsin, | |
|     *Defendants* | |

## Verified Complaint for Declaratory and Injunctive Relief

Plaintiffs Michael Langenhorst, Michael D. LeMay, and Stephen Fifrick (collectively

"Voters") complain as follows:

1

## Introduction

1.    This is a civil action for declaratory and injunctive relief concerning violations of Voters' voting and equal-protection rights by election officials' inclusion of illegal Presidential Elector results in certain counties, which inclusion unlawfully dilutes Voters' lawful votes and requires invalidation of those presidential-election results in counties with evidence that sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3, 2020 presidential election in this state.

2.    In particular, Plaintiffs possess advanced technical capability to conduct statistical analyses identifying errors and anomalies such double votes, votes by non-registered persons, votes by persons who are deceased or moved out of state, and the like. Plaintiffs seek immediate production of registration, election, and other data to conduct and present those analyses to the Court.

3.    Voters seek a remedy excluding presidential-election results from such counties in the certification activities for Presidential Electors described in 3 U.S.C. § 6:

> It shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment, to communicate by registered mail under the seal of the State to the Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast; and it shall also thereupon be the duty of the executive of each State to deliver to the electors of such State, on or before the day on which they are required by section 7 of this title to meet, six duplicate-originals of the same certificate under the seal of the State; and if there shall have been any final determination in a State in the manner provided for by law of a controversy or contest concerning the appointment of all or any of the electors of such State, it shall be the duty of the executive of such State, as soon as practicable after such determination, to communicate under the seal of the State to the Archivist of the United States a certificate of such determination in form and manner as the same shall have been made; and the certificate or certificates so received by the Archivist of the United States shall be preserved by him for one year and shall be a part of the public records of his office and shall be open to public inspection; and the Archivist of the United States at the first meeting of Congress thereafter shall transmit to the two Houses of Congress copies in full of each and every such certificate so received at the National Archives and Records Administration.

## Jurisdiction and Venue

4.   This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution.

5.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202.

6.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b) because at least one of the Defendants to this action resides in this District and all Defendants reside in this State.

## Parties

7.   All Plaintiffs are eligible registered voters in this State and were qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in this State.

8.   Plaintiff Michael Langenhorst is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Door County.

9.   Plaintiff Michael LeMay is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Brown County.

10.   Plaintiff Stephen Fifrick is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Oconto County.

11.   All Defendants are persons authorized by federal and state law to be involved in the process of certifying Presidential Electors as described in 3 U.S.C. § 6.

3

12. Laure Pecore is the Clerk of Menominee County, Wisconsin. In that capacity, she certifies the results of elections within Menominee County and submits the same to the Wisconsin Election Commission. Wis. Stat. § 7.60.

13. Defendant George L. Christenson is the Clerk of Milwaukee County, Wisconsin, and Julietta Henry is the Milwaukee County, Wisconsin Elections Director, and Rick Baas, Dawn Martin, and Tim Posnanski, are Milwaukee County, Wisconsin Election Commissioners. The Milwaukee County Clerk and the Milwaukee County Election Commission canvas and certify the results of elections within the County of Milwaukee and submit the same to the Wisconsin Election Commission. Wis. Stat. § 7.60. These defendants are all sued in their official capacities.

14. Scott McDonell is the Clerk of Dane County, Wisconsin. In that official capacity, he certifies the results of elections within Dane County and submits the same to the Wisconsin Election Commission. Wis. Stat. § 7.60.

15. Ann S. Jacobs, sued in her official capacity, Mark L. Thomsen, sued in his official capacity, Marge Bostelmann, sued in her official capacity, and Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., sued in their official capacities, are Wisconsin Election Commissioners. Under Wis. Stat. § 7.70(1)(a), the Wisconsin Election Commission records the election results by counties and pursuant to subsection (3) canvasses the returns and makes certifications on or before the first day of December following a general election. Under Wis. Stat. § 7.70(5)(a) & (b), the Wisconsin Election Commission prepares certificates of election and for presidential electors, and "prepare[s] a certificate showing the determination of the results of the canvass and the names of the persons elected," to present to the Governor for signature.

16. Defendant Governor Evers, sued in his official capacity, is required as the state "executive" to finalize, execute, and send required certificates for Presidential Electors under 3

4

U.S.C. § 6. *See also* Wis. Stat. § 7.70(5)(b) ("the [G]overnor shall sign, affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services.").

## Facts

17.    The state certification of Presidential Electors prescribed in 3 U.S.C. § 6, will occur this year by December 8, and the Electoral College votes on December 14. Voters seek a decision from this Court well before then to allow for possible appeal as necessary, as set out in a separate motion for expedited consideration.

18.    By the law of this state, Wis. Stat. § 7.70, the Chairperson of the Wisconsin Election Commission or a designee of the Chairperson shall canvass the returns on or before the first day of December following a general election. Wis. Stat. § 7.70(3). Immediately after the time for filing a petition for recount expires, the Wisconsin Election Commission prepares certificates of election, *id.* § 7.70(5) and for presidential electors "prepare[s] a certificate showing the determination of the results of the canvass and the names of the persons elected," to present to the Governor for signature. *Id.* Sec. 7.70(5)(b)[state law provisions regarding the process of certifying Presidential Electors and deadline dates for various actions].

***Presidential-Election Results in Key Counties***

19.    The unofficial statewide vote count for Wisconsin was 1,630,503 to 1,610,076 in favor of Biden/Harris. *Unofficial Election Results 2020 by County 11-5-2020*, https://elections.wi.gov/node/7234 (last visited Nov. 10, 2020). Milwaukee County vote count was 317,251 for Biden/Harris, 134,355 for Trump/Pence. *Milwaukee County Election Results* https://county.milwaukee.gov/EN/County-Clerk/Off-Nav/Election-Results/Election-Results-Fall-2020 (last visited Nov. 10, 2020). In Menominee County, the vote count was 1303 to 278 in

favor of Biden/Harris. *Official Results for November 3, 2020 General Election*,

https://www.co.menominee.wi.us/i/f/OFFICIAL%20RESULTS%20FOR%20NOVEMBER%20
3.pdf (last visited Nov. 10, 2020). In Dane County, the vote count was 260,157 to 78,789 in

favor of Biden/Harris. *Dane County Clerk's Office Voter Information*,

https://elections.countyofdane.com/Election-Result/124 (last visited Nov. 10, 2020).

***Sufficient Evidence Exists to Place in Doubt Presidential-Election Results in Key Counties***

20.    There exists sufficient evidence to place in doubt the November 3 presidential-election

results in identified key counties. Some of that evidence follows.

21.    The Supreme Court has already concluded (citing evidence)[1] that vote fraud occurs

more with mailed ballots than in-person ballots, making that true as a matter of law. *Crawford v.

Marion Cty. Elect'n Bd.*, 553 U.S. 181, 191-97 (2008); *see also Griffin v. Roupas*, 385 F.3d

1128, 1130-31 (7th Cir. 2004) (same). In close races such fraud can swing elections. Since

*Crawford* already recognized this risk, it *need not be proven*. Absentee ballots that are sent to

addresses where individuals have moved, etc. are an even greater threat because they leave

unclaimed ballots available to those who would use them for vote fraud. The Seventh Circuit

recognizes that [v]oting fraud is a serious problem in U.S. elections generally" that is especially

"facilitated by absentee voting," *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004),

because "voting by mail makes vote fraud much easier to commit," *Nader v. Keith*, 385 F.3d

729, 734 (7th Cir. 2004).

---

[1] *Crawford* relied in part on the Carter-Baker Report, prepared by a bipartisan commission co-chaired
by President Carter, which said mailed ballots are "the largest source of potential voter fraud" and are
"likely to increase the risk of fraud and of contested elections." Commission on Federal Election Reform,
*Building Confidence in U.S. Elections* 35, 46 (2005), *available at* bit.ly/3dXH7rU.

22.    As *Crawford* conclusively establishes, Congress found that election validity depends on an accurate, effective systems of voter registration and tabulation, and the lack of such a system precludes reliability and public confidence in election outcomes.

> "A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed.

> "There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo [identification cards] currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." Building Confidence in U.S. Elections § 2.5 (Sept.2005), App. 136–137 (Carter–Baker Report) (footnote omitted).

*Crawford*, 553 U.S. 193–94, 128 S. Ct. 1618 (footnotes omitted).

23.    *Crawford* establishes in particular the fraud risk inherent in mailed ballots. Examples abound in *Crawford*'s cited authorities and in The Heritage Foundation's *A Sampling of Recent Election Fraud Cases from Across the United States* with1,296 cases of documented voter fraud in recent years. *See* heritage.org/voterfraud. Recently, in Patterson, New Jersey, four men were charged with criminal election fraud involving mail-ballot voting.[2] There was also evidence of a voter carrying numerous ballots and postal workers leaving ballots sitting out in building lobbies, making them available for fraudulent use.[3] A Democratic operative described his vote-fraud experience, noting it is "plenty common" and explaining schemes he's readily employed, including ballot harvesting, ballot tampering, coercion, and bribery.[4] These examples reenforce

---

[2] Vogt, *All-Mail Pandemic Election Ends IN Fraud Charges Against NJ Politicians*, New Jerzey 101.5, June 25, 2020, nj1015.com/all-mail-pandemic-election-ends-in-fraud-charges-against-nj-politicians/?trackback=fbshare_mobile.

[3] Re, *Mail-in voting faces slew of issues nationwide, as emergency USPS memo sounds alarm*, Fox News, July 22, 2020, www.foxnews.com/politics/mail-in-voting-faces-slew-of-issues-nationwide.

[4] Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*, The New York Post, August 29, 2020, nypost.com/2020/08/29/political-insider-explains-voter-fraud-with-mail-in-ballots.

what *Crawford, Griffin*, and *Nader* established—that mailed ballots pose a real and higher risk of fraud that legislatures must balance in prescribing an election's manner.

24. Wisconsin greatly expanded the scope of mailed ballots in 2020. By October 28, 1,778,157 Wisconsin voters had requested absentee ballots. Stephanie Saul, *Supreme Court Galvanizes Push for Early Voting by Wisconsin Democrats*, N.Y. Times, Nov. 4, 2020 (https://www.nytimes.com/2020/10/27/us/politics/wisconsin-absentee-ballots-election.html) (last visited Nov. 11, 2020). In total Menominee County sent out 616 (of which 560 were returned), Dane County sent out 266,957 (254,335 were returned), and Milwaukee County sent out 345,871 (of which 325,587 were returned). *See* Wisconsin Elections Commission, *Absentee Ballot Report: Nov. 3, 2020 General Election* (Nov. 6, 2020) (https://elections.wi.gov/index.php/node/7236) (last visited Nov. 11, 2020).

25. Those numbers are equal to 34.4% of Menominee County's registered voters, 62% of Milwaukee County's registered voters, and 68.2% of Dane County's registered voters. *See* Wisconsin Elections Commission, Nov. 1, 2020 *Voter Registration Statistics* (Nov. 1, 2020) (https://elections.wi.gov/index.php/node/7236) (last visited Nov. 11, 2020).

26. Mailed ballots pose special fraud risks, and state legislatures have the authority and are equipped to balance access and integrity in the mailed-ballot context. *Griffin*, 385 F.3d at 1130-31. In Wisconsin, an absentee voter typically must provide a valid ID for voting, like a driver's license. *See* Joseph T. Kreye, Staci Duros, Wisconsin Legislative Reference Bureau, *Memorandum:* Questions *Related to "Indefinitely Confined" Absentee Ballots* (Mar. 26, 2020) ("LRB Memo").

(https://legis.wisconsin.gov/senate/13/fitzgerald/media/1401/absenteeballotquestions_fitzgerald_

03262020.pdf ) (last visited Nov. 11, 2020). But the 2020 election saw a 238% increase in a type of absentee ballot that does not require the ID normally required of an absentee ballot. Starting in early spring 2020, the Town of Menominee encouraged voters to vote absentee, included instructions and standards, including that "indefinitely confined" voters "are not required to provide a photo ID." Town of Menominee, Press Release, *Voters Encouraged to Vote Absentee for April 7 Election* (Mar. 16, 2020)

(https://www.co.menominee.wi.us/i/f/Menominee%20County-Town%20of%20Menominee%20Encouraging%20Absentee%20Voting%20Due%20to%20COVID-19.pdf ) (last visited Nov. 11, 2020).

27.    As a result, Menominee County saw the greatest increase in indefinitely confined voters in the state. MacIver Institute, *A Quarter-Million Wisconsin Voters Claim To Be "Indefinitely Confined" And Not Bound By Voter ID* (Oct. 29, 2020)

(https://www.maciverinstitute.com/2020/10/a-quarter-million-wisconsin-voters-claim-to-be-indefinitely-confined/ ) (last visited Nov. 11, 2020).

28.    Dane County and Milwaukee County openly advised voters to indicate that they are "indefinitely confined," under Wis. Stat. § 6.86(2) and thus, inter alia, excused from providing a photo ID. *See* Laurel White, Wisconsin Public Radio, *County Clerks' Guidance On Voter ID Law Amid Pandemic Irks Wisconsin GOP* (Mar. 26, 2020) (https://www.wpr.org/county-clerks-guidance-voter-id-law-amid-pandemic-irks-wisconsin-gop ) (last visited Nov. 11, 2020).

29.    The Chair of the Wisconsin Senate Committee on Elections recognized that these counties' unilaterally disregarding the legal standards governing "indefinitely confined" status would effectively "disenfranchise electors in other areas of the state" and that even if properly adopted and employed statewide, the practice should be limited so that only already-registered

requesters were allowed to forego the photo ID requirement, and that newly-filed indefinitely confined forms should be effective for only this election. *Letter from Senator Kathy Bernier to Wisconsin Elections Commission* (Mar. 26, 2020) (https://www.wpr.org/sites/default/files/bernier_-_letter_to_elections_commission.pdf)[5] (last visited Nov. 11, 2020).

30. Regardless of the validity of the defendant counties' actions in encouraging the application for "indefinitely confined" absentee ballots, 243,900 of such ballots were distributed by the time of the 2020 general election.[6] This includes 23,379 (an increase of 16,943 over 2019) in the City of Milwaukee and 8993 (an increase of 6199 over 2019) in Madison by May 20, 2020.[7]Wisconsin Elections Commission *Meeting of the Wisconsin Elections Commission* 55 (May 20, 2020). (https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/ WEC%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%20PowerPoint%20Presentation.pdf ) (last visited Nov. 11, 2020).

---

[5] The Wisconsin Legislative Reference Bureau advised that

it would seem inconsistent with current law for a clerk or other election official to suggest that every individual in this state is indefinitely confined for purposes of receiving an absentee ballot, and without providing voter identification, because of emergency orders issued by DHS relating to a public health emergency that do not require residents to remain at home for all purposes.

LRB Memo. The statutory meaning of "indefinitely confined" is the subject of ongoing litigation that currently rests with the Wisconsin Supreme Court.

[6] Once "qualified," voters receive absentee ballots unless and until they notify officials that their "indefinite confinement" has ended—that is, a voter self-certifies their status. Nearly 200,000 voters used the exception to vote without ID in the spring primary, *see* Patrick Marley, Milwaukee Journal Sentinel*, Nearly 200,000 Wisconsin Voters Did Not Have to Show a Photo Id in the April Election*  (May 26, 2020) (https://www.jsonline.com/story/news/politics/2020/05/26/200-000-wisconsin-voters-did-not-have-show-id-april-election/5246892002/), and another 49,769 did so in the fall general election. *See* Dan O'Donnell,  MacIver Institute, *How The Wisconsin Elections Commission Destroyed Fair Elections In Wisconsin* (Nov. 5, 2020) (https://www.maciverinstitute.com/2020/11/how-the-wisconsin-elections-commission-destroyed-fair-elections-in-wisconsin/) (last visited Nov. 11, 2020).

[7] This does not include, of course, those additional indefinitely confined voters added between May and the general election.

31.    Wisconsin Statutes § 6.87(6d) specifies that an absentee ballot be signed by a witness and include the witness's address and provides that "[i]f a certificate is missing the address of a witness, the ballot may not be counted." Instructions provided by the Wisconsin Elections Commission for absentee ballots dated Aug. 18, 2020 warned that if the address was missing, the ballot would not be counted. Wisconsin Elections Commission, *Uniform Instructions for Wisconsin Absentee Voters* 1 ([https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Uniform%20Absentee%20Instructions%20-%20Current%20-%20By-Mail%20Voters.pdf](https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Uniform%20Absentee%20Instructions%20-%20Current%20-%20By-Mail%20Voters.pdf)) (last visited Nov. 11, 2020).

32.    On October 19, Wisconsin Election Commission sent instructions to clerks that this defect could in fact be "cured" by the clerk without the witness appearing. Wisconsin Elections Commission, *Spoiling Absentee Ballot Guidance* 3 (Oct. 19, 2020) ([https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf](https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf) ) (last visited Nov. 11, 2020). The phrase "[i]f a certificate is missing the address of a witness, the ballot may not be counted" has not been authoritatively construed as "directory" rather than mandatory, *see Lanser v. Koconis*, 62 Wis.2d 86, 91 (1974), and thus clerks have no authority to accept the ballot rather than invalidate it.[8]

33.    Election workers, overwhelmed by the sudden flood of mailed ballots, have less ability to carefully review them to screen out fraudulent ones, creating a substantial risk that fraudulent votes will be counted and vote-dilution disenfranchisement will occur.

34.    Wisconsin has a history of voter fraud claims. Since 2016, when records of such instances were first required to be reported to the state Legislature, Wisconsin has had 238

---

[8] And even if the statute could properly be construed by the Wisconsin Elections Commission as directory on October 19, the Commission has unconstitutionally employed different and unclear standards affecting the validity of a vote and the affected votes should be excluded from the final count. *See infra* ¶ 56.

reported cases of possible voter fraud. Laurel White, Wisconsin Public Radio, *Wisconsin Clerks Reported 238 Possible Voter Fraud Cases Since 2016* (Nov. 10, 2020)

(https://www.wpr.org/wisconsin-clerks-reported-238-possible-voter-fraud-cases-2016) (last visited Nov. 11, 2020). These include[9] 109 cases of undeliverable Election Day registration confirmations, 38 cases of voting twice in the same election, either in separate municipalities or by mail and again in person, and 14 cases of voting by felons, non-citizens, "ineligible," or deceased voters, and 3 cases of providing an incorrect address in a registration. *Id.*

35.     Wisconsin State Assembly Speaker has ordered an investigation ahead of the Trump campaign's impending recount,[10] to focus on the "inefficiency" of Milwaukee's central counting, reports of voter fraud, and the "removal of voters from the rolls who no longer live here." Jason Calvi, *Speaker Vos Calls for Election Review after Questions Swirl of Voter Fraud* (https://www.fox6now.com/news/speaker-vos-calls-for-election-review-after-questions-swirl-of-voter-fraud) (last visited Nov. 11, 2020).

36.     Brown County's elected County Clerk notified an attorney at the Wisconsin Election Commission that two partisan consultants who were not election inspectors, one working for a nonprofit via an outside grant to the City of Green Bay and the other a community liaison for the Democratic mayor of Green Bay, had, contrary to law, advised and instructed poll workers at the Brown County central counting facility with regard to handling and counting ballots. *See* Jim Piwowarczyk & Jessica McBride, Wisconsin Right Now, *Green Bay Election Count Was "Tainted," Says Brown County Clerk* (https://www.wisconsinrightnow.com/2020/11/10/green-

---

[9] 69 cases were reports of 17-year-olds attempting to vote in 2017, allegedly based on misinformation that they were eligible as long as they turned 18 by the fall election.

[10] *See* Bill Stepien *Trump Campaign Statement on Wisconsin* (Nov. 4, 2020) (https://www.donaldjtrump.com/media/trump-campaign-statement-on-wisconsin/) (last visited Nov. 11, 2020).

12

bay-election-tainted-clerk/?amp=1) (last visited Nov. 11, 2020). Two election observers, one of which is an election attorney, said that the two were, in fact, "directing" and "engaging with people very directly on ballots," "advising people on how to process ballots," and "involved" when "poll workers would raise their hand."

37.    [11]JC lives in the City of Milwaukee. On November 3, she went to her polling place to vote in person. When she arrived and attempted to sign in and obtain a ballot, poll worker told her that she had already requested an absentee ballot by mail. However, JC had never requested an absentee ballot, and therefore requested a ballot to vote in person. When she told the poll worker that she had not requested an absentee ballot and wanted to vote in person, the worker replied "That's OK" and gave her a ballot. When JC finished voting, a poll worker was standing next to the tabulating machine, asking voters what ward they were, and taking their ballots and looking at them before placing them in the machine. JC refused to give the worker her ballot and placed it in the machine herself. Also, her daughter had earlier begun registering to vote online, but decided not to upload her identification, so never completed the online process and never requested an absentee ballot by mail. However, her daughter later received an absentee ballot by mail anyway.

38.    LL is an election supervisor in the Village of Menomonee Falls. On election day, while moving from table to table and around the polling location, she was asked many times by poll

---

[11] Allegations in paragraphs 37 – 42 were collected by counsel on or about November 11, 2020. On knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, counsel asserts upon information and belief that the contentions in paragraphs 31-34 have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The several gathered reports in paragraph 35 could not be verified one by one under the severe time constraints typical of election litigation. The disjuncture between the time needed to gather and present evidence of widespread voter dilution by illegal ballots and the time inherently available to do so underscores the need for the reasonable method of providing plaintiffs the data-based statistical approach that is proposed herein.

workers if a voter who had been issued an absentee ballot was allowed to vote in-person when the ballot's signature box is printed "Absentee Issued." She advised the workers that the voter could vote in person as long as the voter had not returned the absentee ballot. Through the day, at least 10 of those voters stated to the effect, "I didn't even ask for this ballot." LL and the workers asked those voters to tear the absentee ballots before voting in person. The voters did so and gave the torn ballots to the workers to include with election materials.

39.    Because Menomonee Falls elections staff is careful about checking obituaries and removing absentee ballots of those who die before election day, LL also randomly checked several online obituaries in Dane and Milwaukee Counties and cross-checked names against the WEC voter list at myvotewi.gov. In less than 10 minutes, LL found three instances of deceased individuals in Dane and Milwaukee Counties who were still shown by myvotewi.gov as having voted absentee:

>    Mary L. Benson, Wauwatosa – born 11/12/1945 d. 10/16/20 – Completed absentee received 10/1/20.
>
>    Patricia (Patti) Farrell, Milwaukee – b. 9/1/1951 d. 10/20/20 – Completed absentee received  9/29/20
>
>    Dr. John Odom, Madison – b. 9/22/1948, d. 10/30/20 – Completed absentee received 9/23/20

40.    T.S. and G.S. from Eau Claire, Wisconsin received instructions from the WEC by mail advising how to request ballots and vote by mail. They did not respond and did not request ballots from WEC, either by mail or on line. However, each received a ballot addressed from the WEC personally addressed to them. They destroyed the ballots and voted in person.

41.    CL is a college student in North Dakota, registered to vote in Wisconsin. She requested to be mailed an absentee ballot so that she could vote by mail. She received instructions from WEC to submit ID. However, before returning the request and submitting ID, she received a

14

ballot by mail and never did submit the ID. She destroyed the ballot and returned to Wisconsin to vote in person.

42. CL is from Prescott, Wisconsin. While canvassing for the Susan B. Anthony List, a resident told her he had received 10 ballots mailed to him from the WEC, even though he did not request them. He stated that his neighbors had also received 10 ballots without requesting them.

43. This evidence suffices to place in doubt the November 3 presidential-election results in identified counties and/or the state as a whole. Indeed, issues with thousands of votes cast warrants investigation of the rest.

***Further Evidence To Be Provided From Relevant Records***

44. In addition to the foregoing evidence, Voters will provide evidence, upon information and belief, that sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results. This will be in the form of expert reports based on data analysis comparing state mail-in/absentee, provisional, and poll-book records with state voter-registration databases, United States Postal Service ("USPS") records, Social Security records, criminal-justice records, department-of-motor-vehicle records, and other governmental and commercial sources by using sophisticated and groundbreaking programs to determine the extent of illegal voters and illegal votes, including double votes, votes by ineligible voters, votes by phantom (fictitious) voters, felon votes (where illegal), non-citizen votes, illegal ballot harvesting, and pattern recognition to identify broader underlying subversion of the election results. Plaintiffs have persons with such expertise and data-analysis software already in place who have begun preliminary analysis of available data to which final data, such as the official poll list, will be added and reports generated.

45.   Upon information and belief, the expert report will identify persons who cast votes illegally by casting multiple ballots, were deceased, had moved, or were otherwise not qualified to vote in the November 3 presidential election, along with evidence of illegal ballot stuffing, ballot harvesting, and other illegal voting. This evidence will be shortly forthcoming when the relevant official documents are final and available, for which discovery may be required, and the result of the analysis and expert reports based thereon will show that sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results.

46.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

## Claims

### Count I

**Certifying Presidential Electors Without Excluding Certain Counties Would Violate Voters' Fundamental Right to Vote by Vote-Dilution Disenfranchisement.**

**(42 U.S.C. § 1983; U.S. Const. amends. 1 and 14)**

47.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

48.   Certifying Presidential Electors without excluding certain counties would violate voters' fundamental right to vote by vote-dilution disenfranchisement.

49.   The counties at issue are those identified in the Facts where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results.

50. The right to vote, with the included right to have one's vote counted, is protected by the First and Fourteenth Amendments and is fundamental, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966), and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted, *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

51. "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (internal citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.*

52. If Defendants certify presidential-election results from counties where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election result, Voters' valid, legal votes will be unconstitutionally diluted by illegal votes.

53. As recognized in *Donald J. Trump for President v. Bullock*, 2020 WL 5810556 (D. Mont. Sept. 30, 20200, individual voters have standing to bring a vote-dilution disenfranchisement claim, *id.* at *7 & n.4. "[T]he Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue." *Id.* at 7. *See also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("[A] person's right to vote is 'individual and personal in nature,'" so "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage" (citations omitted)). Under the generalized-grievance formulations in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), this claim is not a generalized grievance. *Lujan* said it turns on whether a plaintiff (i) is merely asserting "citizen" standing, i.e., the same claim that could be asserted by "every citizen," and (ii) just trying to

17

make the government do its job. *Id.* at 560-61. Voters don't bring their claims under mere "citizen" standing but rather assert personal harms from the violation of their own fundamental right to vote. Their claim is particularized, challenging only what violates their rights. Their harm is not the same as for every "citizen." "[D]enying standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973); *see also, FEC v. Akins*, 524 U.S. 11, 24 (1998). Voters' harm is four levels more specific than "every citizen['s]" for their claim: (1) within "citizens" are those eligible to register as voters—only they have the potential to become registered voters; (2), within eligible voters are registered voters—only they have a right to vote; (3) within eligible, registered voters are those who actually voted—only they have a vote subject to vote-dilution disenfranchisement; and (4) within these eligible, registered, voters who actually voted are those in a jurisdiction where there are counties with evidence that sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3 presidential election. Those very specific voters with a very specific claim don't assert a generalized grievance, and they include Voters. Thus, Voters have standing.

54. As established in the Facts discussion, existing and forthcoming evidence establish that in identified counties illegal voting has occurred in connection with the presidential-election results, which establishes that Voters' votes have been unconstitutionally diluted. So the presidential-election elections in those counties should be invalidated and not included in the certification of votes for selecting Presidential Electors.

55. The relevant standard for invalidating election results from a particular jurisdiction generally is that "'the party contesting the election demonstrates an irregularity or illegality

sufficient to change or place in doubt the result.'" 26 Am. Jur. 2d Elections § 389   (quoting *Gore v. Harris*, 772 So.2d 1234 (Fla. 2000), *rev'd on other grounds*, *Bush v. Gore*, 531 U.S. 98 (2000)). "Ordinarily, an election may be contested only for matters that would impeach the fairness of the result." *Id.* (citing *Duncan v. McMurray*, 249 S.W.2d 156 (Ky. 1952); *Appeal of Soucy*, 649 A.2d 60 (N.H. 1994); *Fielding v. South Carolina Election Com'n*, 408 S.E.2d 232 (S.C. 1991). "An election will not be invalidated unless the party contesting the election demonstrates an irregularity or illegality sufficient to change or place in doubt the result." *Id.* (citing *Middleton v. Smith*, 539 S.E.2d 163 (Ga. 2000)).

56.    In *Harris*, the Florida statute included as grounds for contesting an election "'Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.'" 772 So.2d at 1250 (citation and emphasis omitted). *Harris* summarized the standard thus: "It is not enough to show a reasonable possibility that election results could have been altered by such irregularities, or inaccuracies, rather, a reasonable probability that the results of the election would have been changed must be shown." *Id.* at 1255.

57.    This generally recognized standard is reflected in this State's "outcome" rule that applies in most cases of election irregularities—however, Wisconsin law treats differently a case involving deprivation of the right to vote. *McNally v. Tollander*, 100 Wis.2d 490, 500 (1981) (citing *Clapp v. Joint School District*, 21 Wis.2d 473 (1963)). Where, as Voters believe the case to be here, "the exclusion of [a large number of] voters "so undermines the appearance of fairness in the election . . . the election must be set aside." *Id.* at 503. That is, in Wisconsin, "in a case where deprivations of the right to vote are so significant in number or so egregious in character as to seriously undermine the appearance of fairness, we hold such an election must be

set aside, *even where the outcome of the election might not be changed*." *Id.* at 505 (emphasis

added). Lest there be any doubt on this, the Wisconsin Supreme Court instructed that

> "courts should use their discretion to avoid elections where proven violations have
> undermined the appearance of fairness of an election. For example, when many voters see
> election officials stuffing ballot boxes, or when large numbers of voters are prevented from
> voting, public confidence in the integrity of the election and popular acceptance of the
> winner may be severely impaired. In such cases a new election might be justified to remedy
> these effects, regardless of the likelihood that the election's outcome was altered."

*Id.* at 505-06 (quoting Developments In The Law of Elections, 88 Harv.L.Rev. 1111, 1330

(1975).

58.    In addition to *states* routinely providing for invalidating election results, including in

the Presidential Electors context, the U.S. Supreme Court *itself* in *Bush*, 531 U.S. 98, required

that partial recounts in some counties (that unconstitutionally employed different and unclear

standards for determining voter intent) be excluded from the final count in the Florida 2000

presidential election because of the constitutional flaws identified, *id.* at 107-12.

59.    The foregoing articulations of the standard for invalidating election results in a

particular jurisdiction—including proof of reasonable probability by credible statistical

evidence—should be applied here to determine whether the election results in certain counties

should be excluded for purposes of certifying Presidential Electors. In some situations where

election results are invalidated, a new election is ordered. *See, e.g.*, *Pabey v. Pastrick*, 816

N.E.2d 1138 (Ind. 2004). But with the Electoral College scheduled to be certified by December 8

and to meet and vote on December 14, 2020, there is insufficient time for a new election in the

counties involved. Moreover, the Electoral College is unique and statutory provisions provide

special procedures for moving the Electoral College vote along expeditiously since the

presidency is at issue. So the proper remedy here is to exclude the results from jurisdictions

Case 1:20-cv-01701-WCG   Filed 11/12/20   Page 20 of 25   Document 4

meeting the standard for disqualifying elections from the final results that are certified and reported for Presidential Electors.

60. Because illegal votes dilute legal votes, the evidence establishes, and will establish, that the rights of Voters have been violated by vote-dilution disenfranchisement. Consequently, the presidential-election results from the counties identified should not be included in certified and reported totals for Presidential Electors from this state.

## Prayer for Relief

61. Declare that the inclusion of illegal votes in identified counties violates Voters' right to vote under the First and Fourteenth Amendment by vote-dilution disenfranchisement.

62. Declare that the proper remedy for this constitutional violation as applied to presidential-election results is to exclude presidential-election results from those counties for the Presidential Elector certification under 3 U.S.C. § 6 for this state.

63. Under that remedy, declare that there is sufficient evidence that illegal votes were counted in the identified county or counties to change or place in doubt the results of the November 3, 2020 presidential election results in contested counties, so that the county's presidential-election results must be invalidated.

64. Enjoin Defendants from preparing and conducting the certification activities for Presidential Electors described in 3 U.S.C. § 6 (and applicable state law implementing the federal provision) without excluding the presidential-election results from the identified counties.

65. Award Voters their costs and attorneys fees under 42 U.S.C. § 1988 and any other applicable authority; and

66. Grant any and all other such relief as this Court deems just and equitable.

Date: November 12, 2020

Respectfully Submitted,

*Local Counsel for Plaintiffs*

/s/ *Michael D. Dean*

_____
Michael D. Dean (WI # SBN 01019171)
  miked@michaelddeanllc.com

P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044

*Lead Counsel for Plaintiffs*

James Bopp, Jr. (IN #2838-84)
  jboppjr@aol.com
Richard E. Coleson (IN #11527)
  rcoleson@bopplaw.com
Jeffrey P. Gallant (VA #46876)
  jgallant@bopplaw.com
Rob Citak (KY #98023)
  rcitak@bopplaw.com

True the Vote, Inc.
Validate the Vote Project
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434

## Verification

I, Michael D LeMay, declare as follows:

**1.** I am a resident of Wisconsin.

**2.** If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Declaratory and Injunctive Relief.*

**3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November 10, 2020.

# Verification

I, _Michael Langenhorst_, declare as follows:

**1.** I am a resident of Wisconsin.

**2.** If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*.

**3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November _11_, 2020.

# Verification

I, Stephen Fifrick, declare as follows:

   **1.** I am a resident of Oconto County, Wisconsin.

   **2.** If called upon to testify, I would testify competently as to the matters set forth in the fore-going *Verified Complaint for Declaratory and Injunctive Relief.*

   **3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November _10_, 2020.

_____
Stephen Fifrick